512 West 56th Street Corporation v. Commissioner.
512 West 56th St. Corp. v. Commissioner
Docket No. 2949.
United States Tax Court
1945 Tax Ct. Memo LEXIS 344; 4 T.C.M. (CCH) 53; T.C.M. (RIA) 45016; January 17, 1945
Paul V. Wolfe, Esq., 18 E. 48th St., New York, N.Y., for the petitioner. Thomas R. Charshee, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent determined deficiences in income tax and declared value excess-profits tax for the year 1939, in the amounts of $6,455.42 and $3,865.75, respectively. Both petitioner and respondent have conceded certain minor adjustments. The petitioner alleges that respondent in recomputing petitioner's taxable net income committed the following errors: (1) In disallowing a deduction of $58,472.01, which petitioner on its return claimed as an ordinary loss, arising from the sale of certain property which it contends was held primarily for sale to customers in the ordinary course of *345 its trade or business; and (2) in including as ordinary taxable income the sum of $50,000 received by petitioner, a lessee, as consideration for a waiver by it of a right to renew a lease, and a waiver of a right to remove a building erected on the leased premises. Findings of Fact Facts of General Application The petitioner is a New York corporation, and was incorporated on August 6, 1918. Its charter empowered it to purchase, exchange, lease or acquire real estate and to own, hold, manage and develop such real estate. It was authorized to construct or improve any and all kinds of buildings, and to sell, manage, improve, lease or sub-lease any of its real property. In addition, it was empowered to transact a general real estate agency and brokerage business; to deal in building materials or merchandise; to manufacture and sell various kinds of machinery; and in general, to carry on any lawful trade or business. Petitioner was organized by Ringland F. Kilpatrick for the purpose, of holding title to a piece of property on West 56th Street, City of New York, which will be more particularly described under the facts of Issue 2 herein. At that time, Kilpatrick had been engaged *346 in real estate activities for a number of years, and owned the majority stock of similar corporations organized to hold title to specific real property. Kilpatrick owned 97 percent of petitioner's stock from 1918 until 1927. In the latter year, he gave his stock in petitioner to his wife, and in the taxable year, she was the sole stockholder of petitioner's outstanding stock. Kilpatrick was one of petitioner's officers from 1920 through 1939. Issue 1. In 1926, Kilpatrick was approached by an associate of the realty firm of Shaw & Sanford with regard to a parcel of vacant land located at 196th Street and Jerome Avenue in the Borough of the Bronx, City of New York. It was proposed that Kilpatrick furnish the money for the purchase of the land and the erection of an improvement thereon. Shaw & Sanford agreed to have plans for an improvement drawn, to supervise the construction, and to endeavor to sell the property after the construction was completed. Thereafter, Kilpatrick supplied the money to purchase the vacant land, and on March 16, 1926, an agreement was entered into between Kilpatrick and Shaw & Sanford, as evidenced by the following letter from Kilpatrick to Shaw & Sanford: *347 "This is to acknowledge your communication of recent date in reference to the plot on Jerome Avenue 100 feet south of East 196th Street having a frontage of 175 feet on Jerome Avenue and depth of 130 feet. You enclose a statement covering the purchase of same and the several adjustments showing a deficit of $991.19 for which I herewith enclose my check to your order. "This property was purchased in the name of the Realty Utility Corporation. A corporation organized in your interest, and which was turned over to me for the purpose of holding this property, and this corporation you warrant free of any debts or obligations with the exception of being on the bond of one first mortgage in the sum of $50,000. "It is now understood between us that any profits accruing from the sale of this property either before or after it is improved with building or buildings shall be divided as follows: R. F. Kilpatrick 75%, Shaw and Sanford 25%. In arriving at the profit all sums advanced by me with interest from the dates of such advances or any sums due or owing by me in connection with the ownership or development of this property at the time of sale shall be deducted, and the net balance divided *348 as above provided. "I have the right to decide on the type of improvement if any, and the exclusive right to decide when and at what price the property is to be sold, irrespective of whether or not the sale produces a profit. "In the event that the property is improved the plans, specifications and full supervision of the building operation shall be furnished by Shaw and Sanford without charge under the supervision of Nathan Rotholz, who is associated with you, but it is understood that in the event that a theatre is constructed on said premises he may at his discretion and subject to my approval, employ an architect or engineer as consultant on said plans. Cost of such employment to be considered part of the cost of the building." Thereafter, Kilpatrick advanced the necessary money for the erection of twelve stores on the land. These stores were then rented to tenants. Shaw & Sanford listed the property for sale with other brokers and endeavored to obtain offers from prospective purchasers. On November 22, 1930, petitioner acquired title to the property from the Realty Utility Corporation for a consideration of $100 in cash, an assumption of a first mortgage valued at $45,859, *349 and the assumption of a second mortgage valued at $83,000, or a total cost of $128,959. As of that date, the value of the buildings was $34,000 and the value of the land was $94,989. In 1939, petitioner sold the property for $60,000, the fair market value of the buildings being $18,000, and the fair market value of the land being $42,000. From 1930 to 1939, the buildings had been depreciated by petitioner in the amount of $10,486.99. In its return for the taxable year, petitioner claimed a deduction of $58,472.01 as an ordinary loss resulting from the sale of the property. In the notice of deficiency, respondent determined that the land was a capital asset and limited the loss on the land to $2,000, and allowed a loss of $3,513.01 on the buildings as an ordinary loss. The only real property held by petitioner from the date of its incorporation through the taxable year consisted of the Jerome Avenue property as hereinabove described, a leasehold on West 56th Street, New York City, which will be hereinafter described in Issue 2, and property located at 141 Wooster Street, New York City. The Wooster Street property was a loft building and was acquired by petitioner in 1929. This *350 building was rented by petitioner until the property was lost through foreclosure proceedings at some later date. From 1918 to 1939, petitioner's income consisted of the rents derived from the Jerome Avenue property, the Wooster Street property, and the subletting of the leasehold on the West 56th Street property. The annual rent from the Jerome Avenue property was between $8,000 and $12,000, and the annual rent from the subletting of the leasehold was between $30,000 and $35,000. Between 1918 and 1939, none of petitioner's properties were voluntarily sold by it. However, in 1932 and 1933, there was a slump in the real estate market in New York City. Petitioner's principal business from 1918 to 1939, inclusive, consisted of the renting of its property. The Jerome Avenue property, hereinabove described, was not held primarily for sale to petitioner's customers in the ordinary course of its business. Issue 2. On August 14, 1918, petitioner leased certain vacant land between West 55th Street and West 56th Street in New York City, from the Chapwin Realty Company. The lease was for a term of 21 years and petitioner agreed to pay the lessor an annual rent of $10,000. However, nothing *351 was paid by petitioner to the lessor for the execution of the lease, as such. Petitioner also agreed to pay all taxes and assessments against the property during the term of the lease. It also covenanted to build a brick or concrete garage on the property within one year from the commencement of the term at a cost of no less than $75,000. The lease further provided that if petitioner complied with all the covenants in the lease during the term thereof, the lessor would, at the expiration of the term and at petitioner's option, execute a new lease for the further term of 21 years. It was agreed that the annual rent for the new lease, in the event that the parties might be unable to agree upon such rent, would be determined by a committee composed of property owners in the neighborhood. In no event, however, would the rent be less than $10,000 annually. The original lease also provided that if the lease was not renewed at the end of the term, petitioner was to have the privilege of removing the building erected on the leased premises. Thereafter, and in accordance with the terms of the lease, petitioner erected a two-story garage building on the property at a cost of $125,000. In 1918, *352 petitioner had some negotiations with the Fox Film Company with regard to the possibility of selling the lease. These negotiations were interrupted by reason of the fact that the United States Government requisitioned the garage building and used it for a period of about two years. Thereafter, the property was sublet by petitioner to the United States Post Office and then to the Sheffield Farms Corporation. The sublease to the Sheffield Farms Corporation was for a period of 12 years and expired during the taxable year. The garage was used to house the trucks of the corporation. The rental paid to petitioner by Sheffield was $30,000 annually for the first five years, and $35,000 annually for the remainder of the term. The cost of the garage building to petitioner was fully depreciated over the term of the 21-year lease. On June 15, 1939, petitioner and the lessor, Chapwin Realty Corporation, entered into an agreement, the material provisions of which are as follows: * * * * *
"Whereas the Tenant [petitioner] has waived the right or option contained in said lease to demand a renewal lease for a further term of twenty-one (21) years as provided for therein and the Landlord *353 [Chapwin Realty Corporation] and Tenant have agreed that the same shall be terminated as of July 1, 1939, subject, however, to the provisions of this agreement; and "Whereas the Tenant has waived its privilege of removing the building and/or buildings erected on said demised premises upon the agreement on the part of the Landlord to make a payment therefor of the amount and in the manner hereinafter set forth. "Now, Therefore, This Agreement Witnesseth, That in consideration of the mutual promises and agreements hereinafter set forth the parties hereto have agreed as follows: "1. The Tenant hereby waives any right or option to demand a renewal lease for a further term of twenty-one (21) years as provided for in the said Indenture of Lease dated August 14, 1918 and hereby agrees with the Landlord that said lease and the term thereunder shall expire and come to an end and it will surrender possession of said demised premises on July 1, 1939. "2. The Tenant hereby agrees with the Landlord that it will make the repairs and/or replacements and do the work in or upon the building as now erected on the demised premises as set forth in the schedule hereto annexed and made a part *354 hereof. * * * "The Tenant agrees that all of said work will be done at the sole cost and expense of the tenant and that it will produce to the Landlord receipted bills, invoices and/or vouchers covering the payment in full for all of said work and will furnish to the Landlord an affidavit setting forth all contracts made or charges incurred in connection with such work and setting forth the method of payment therefor, all of which shall be substantiated by said receipted bills, invoices and/or vouchers. "3. The Landlord hereby agrees with the Tenant that it will on July 1, 1939, provided the Tenant shall not be in default hereunder and/or under said lease, pay to the Tenant as a consideration for the foregoing waiver of right of renewal, surrender of possession prior to termination and the making of said repairs and/or replacements, the sum of Fifty Thousand ($50,000) Dollars by the execution and delivery to said Tenant of a first mortgage upon the premises * * *." Attached to the aforesaid agreement and made a part thereof was an extensive schedule of work and repairs to be made on the building by petitioner at its expense. On June 29, 1939, petitioner, pursuant to the agreement *355 of June 15, 1939, executed an indenture, surrendering the lease to the Chapwin Realty Corporation, the lessor. The agreement of June 15, 1939, under which petitioner received the $50,000 first mortgage from the lessor, required petitioner to make extensive repairs on the garage building which, coupled with the waiver of the right to demolish the building and the waiver of the right to renew the lease, effectuated a sale of the building to the lessor. The sale to the lessor of the garage building, which was of a character subject to the allowance for depreciation was not the sale of a capital asset. Opinion Issue 1. Our first question is whether respondent erred in disallowing as an ordinary loss deduction, the loss on the sale of the Jerome Avenue land. In its return for the taxable year, petitioner claimed as an ordinary loss, the amount of $58,472.01, which was arrived at by subtracting the $60,000 received from the sale in the taxable year from petitioner's adjusted basis of $118,472.01. In the notice of deficiency, respondent determined that petitioner sustained a capital loss on the sale of the land, limited to $2,000 under the provisions of section 117(d) of the Internal Revenue Code *356 , and an ordinary loss of $3,513.01 on the buildings. At the hearing, respondent conceded that the loss on the buildings was in a larger amount than originally determined by him. A capital loss, under the statute, is a loss resulting from the sale or exchange of capital assets, and a capital asset is defined by section 117(a)(1) of the Code as "property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (L)." Under the statute in effect during the taxable year, land was considered a capital asset unless it was held by the taxpayer primarily for sale to customers in the ordinary course of his business. The issue, therefore, turns upon whether the Jerome Avenue property was held primarily by petitioner for that purpose. From a study *357 of all the testimony in the record and from all the material and pertinent facts bearing on the question, we cannot find as a fact that the property was held by petitioner primarily for sale to customers in the ordinary course of its trade or business. In order for petitioner to meet the requirements of the statute, it was necessary for it to prove that sales took place with sufficient frequency and continuity to constitute the usual course of business. As pointed out in Snell v. Commissioner, 97 Fed. (2d) 891, an occasional sale of land does not constitute engaging in the "business" of selling land, for "business" means busyness and implies that one is kept more or less busy, and that the activity is an occupation. In order for a taxpayer to defeat a claim to a capital gains rate, he must prove that he has been "in the business of selling his lands." See also Phipps v. Commissioner, 54 Fed. (2d) 469. In this proceeding, the sales in the taxable year were isolated and casual and did not show the frequency or continuity characteristic of "business." Petitioner was incorporated in 1918. Between that date and the taxable year, a period of 21 years, it acquired *358 three properties. None of these properties were voluntarily sold until 1939. They were all improved, income-producing properties, and petitioner's sole income since the date of its incorporation consisted of the rents which they produced. These rents were substantial. The Jerome Avenue property was improved by 12 stores and the annual rental was between $8,000 and $12,000. Petitioner kept this property for 13 years. The garage property on West 56th Street was sublet at an annual rent of between $30,000 and $35,000. Petitioner kept this property for 21 years. The Wooster Street property was also rented and was retained by petitioner until lost through foreclosure proceedings. Under these circumstances, it seems clear that petitioner was engaged in the business of owning and renting real estate and not in the business of buying and selling real estate. Petitioner contends, however, that the Jerome Avenue property was held for sale from the date of its acquisition. It argues that after the buildings were erected, the property was placed in the hands of Shaw & Sanford, who continuously attempted to sell it, and who listed it for sale with various other brokers. We do not doubt that Shaw *359 & Sanford did attempt to secure offers for the property. The only way in which they might benefit under their agreement with Kilpatrick was in the event of a profitable sale. However, under that agreement, Kilpatrick was to determine the price at which the property would be sold. Undoubtedly, if the price offered by a prospective purchaser were high enough, petitioner would be willing to sell. In that sense, the property was for sale since most things are for sale at a price. However, as pointed out in Phipps v. Commissioner, supra, if land is bought with the expectation of selling it when a good price is offered, "such an expectation cannot, in our opinion, convert some sales of land that had been held for seven or eight years into a trade or business in real estate." The argument is also made that since Kilpatrick was engaged in the business of buying and selling real estate, and since petitioner was one of his corporations, his activities should be imputed to petitioner. This argument is untenable for a number of reasons. In the first place, we cannot determine on the record before us that Kilpatrick was engaged in the business of holding property primarily for sale *360 to customers. Secondly, Kilpatrick is not the taxpayer in this proceeding, and during the taxable year, he was not even one of petitioner's stockholders. Thirdly, the general principle is well established that the doctrine of "corporate entity" will be respected where the corporation actually carries on business. Moline Properties, Inc. v. Commissioner, 319 U.S. 436. See also Pope v. Commissioner, 77 Fed. (2d) 599, holding that the officers and chief stockholders of a corporation were not engaged, merely because of that relation, in the business conducted by the corporation. Similarly, in Phipps v. Commissioner, supra, the Court did not impute to the individual taxpayers the activities of corporations which they controlled. Accordingly, the respondent's determination on this issue is sustained. The concession made by him with respect to the loss on the buildings will be adjusted under a Rule 50 recomputation. Issue 2. Petitioner originally valued the $50,000 first mortgage which it received in connection with the West 56th Street transaction at $45,000. It reported this sum on its return for the taxable year as ordinary income. It now concedes *361 that the fair market value of the first mortgage was $50,000, but contends that it is taxable as a capital gain which may be used to offset the capital loss on the Jerome Avenue property. Section 117 (a) (1) of the Code which defines capital assets expressly excludes from the definition "property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (L)." Petitioner contends that it received the $50,000 in exchange for the waiver of rights to renew the lease and to remove the building on the leased premises. It argues that since these rights were contained in the old lease which had no cost basis, the lease and its rights were capital assets since they were not property of a character subject to the allowance for depreciation. It also argues that if the transaction is considered as a sale of the building, the same principle is applicable since the cost of the building was fully recovered prior to sale. The determination of the issue turns upon the proper construction of the facts. If the $50,000 was received by petitioner as consideration for its waiver of the right to renew the lease, petitioner's contentions would *362 be tenable. In that situation, the sale of the right would be the sale of a capital asset since the right was property not within the exclusionary provisions of section 117 (a) (1). However, a fair construction of the facts warrants the conclusion that the consideration was received by petitioner primarily for its agreement to repair the building and not remove it. In effect, petitioner sold the building, which it owned, to the lessor. The value of the right to renew the lease was problematical. The old lease under which petitioner had paid an annual rental of $10,000 to the lessor had proved profitable. If it could have been renewed at the original annual rental of $10,000, petitioner probably would have renewed it. Under the terms of the old lease, however, the annual rent in the event of renewal would be determined by the agreement of the parties, but if no agreement could be reached, then by a committee of property owners in the neighborhood. Under those circumstances, petitioner could not be assured that a renewal of the lease would be remunerative. However, if the waiver of the right to renew the lease had some value and was part of the $50,000 consideration paid, the burden *363 of proof was upon petitioner to show the value of such a right. This, it has failed to do. There is no testimony in the record as to the value of the right to renew the lease, if that right had any value. Petitioner's argument that the sale of the building was the sale of a capital asset because the building had been fully depreciated is untenable. The exclusionary language of the statute deals with property of a character which is subject to the allowance for depreciation and not with property which for some particular reason has been fully depreciated. A building used in the taxpayer's trade or business is property of a character subject to an allowance for depreciation. The fact that depreciation has not been taken or that the building has been fully depreciated is immaterial as long as the property is of a character subject to depreciation. It is held that the $50,000 received by petitioner is taxable as an ordinary gain. Respondent's determination on this issue is sustained. Accordingly, Decision will be entered under Rule 50.